# EXHIBIT C

```
CR02 0181826 S           :  SUPERIOR COURT

STATE OF CONNECTICUT     :  J.D. OF FAIRFIELD

VS.                      :  AT BRIDGEPORT

DOLORES FONSECA          :  MAY 27, 2003
```

BEFORE:  HONORABLE SHERIDAN MOORE, JUDGE

APPEARANCES:

        NICHOLAS BOVE, JR., ESQUIRE
        Senior Assistant State's Attorney

        WILLIAMS BARNES, ESQUIRE
        For the Defendant

        KATHRYN KAY
        Court Monitor

1   A   The first time I saw Officer Larregui and the
2   defendant was standing in the hallway.
3   Q   And was there anyone else in the hallway?
4   A   No, there was not.
5   Q   And was the hallway -- describe the lighting in
6   the hallway?
7   A   The lighting in the hallway was poor. It was not
8   very well lit, very low lighting.
9   Q   And what, if anything, happened next?
10  A   I asked the defendant what had happened and she
11  stated that her sister was a little out of control. I asked
12  her what did she meant by what's a little out of control?
13  And she stated that her sister was making threats.
14  Q   And what did you say?
15  A   I asked her what -- what kind of threats? What do
16  you mean by threats? And she -- then Officer Larregui also
17  asked her that question, and she stated, allegations.
18  Myself and Officer Larregui then asked her what she meant by
19  allegations? She would not tell us.
20  Q   And what happened next?
21  A   Then, you know, I told her, she said that -- that
22  she just wanted us to escort her sister out of her house
23  because she was out of control, that she didn't want her
24  arrested. And I stated to her that it's not up to her
25  whether there's an arrest or not, we have to make that
26  determination once we're called. That the State presses the
27  charges, not me or her. And I told her I had to check her

1  for visible signs of injury.
2      Q    And how did you do that?
3      A    I used my flashlight.
4      Q    Now do you have the flashlight you used that night
5  with you?
6      A    Yes, I do.  This would be it.
7           MR. BOVE:  Can I have this marked for
8           identification?
9           THE COURT:  It should be marked.  State's A.
10          (Whereupon State's Exhibit A was marked for
11          identification).
12     Q    Officer Alterio, I'm now handing you back what's
13  been marked as State's Exhibit A for identification, do you
14  recognize it and what is it?
15     A    This is the flashlight I used on that evening.
16     Q    And that's the same flashlight you had that
17  evening?
18     A    That is correct.
19     Q    And is it in substantially the same condition now
20  as it was then?
21     A    Yes, it is.
22          MR. BOVE:  I'm gonna offer the flashlight as
23          a full exhibit, Your Honor.
24          THE COURT:  Any objection?
25          MR. BARNES:  No objection, Your Honor.
26          THE COURT:  It may be marked as full exhibit,
27          State's A.

1  demonstrate to me first how you would normally check someone
2  for injuries with a flashlight?
3      A    Sure.  Normally, depending on the clothing they
4  have, I would check visible areas, make sure there was no
5  scratches or bruising consistent with that of a struggle or
6  a physical confrontation.
7      Q    And you're approximately three feet from me right
8  now?
9      A    That's correct.
10     Q    Is that the usual distance you'd stand?
11     A    It depends on the circumstances.  Probably.
12     Q    In this case, how far away, if you recall, were
13 you when you put your flashlight on and tried to check for
14 injuries?
15     A    It would have to be about this distance or even a
16 little farther back.
17     Q    Okay.  And would you demonstrate, with me holding
18 the flashlight, how you -- how your hand was knocked down?
19 You had the flashlight on?
20     A    That is correct.
21     Q    Was it straight, were you lifting it up?
22     A    It would be pointed at her neck area.
23     Q    Okay.  What happened?
24     A    She was hitting it down like that.
25     Q    Okay.
26          MR. BOVE:  Let the record reflect he struck
27          my hand with his right hand and --

1   Q   It was the right hand that she used?

2   A   I don't recall which hand it was.

3   Q   Okay. You can go back. Officer Alterio, after
4   she struck your hand the first time causing the flashlight
5   to go downward, then what happened?

6   A   The first time I told her, I said, don't do that
7   again, I used a stern voice, I said, don't do that again and
8   I told her not to touch me. You are committing an assault
9   on a police officer, I don't want to have to arrest you.

10  Q   Okay. So what did you do then, next?

11  A   I then -- she then stated, you can't arrest me. I
12  know the law, you don't know who you're messing with.

13  Q   Okay. Then what happened then?

14  A   I attempted to look at her again and once again
15  she slapped my arm down as demonstrated.

16  Q   Okay. And then what happened after that?

17  A   She stated that, you can't arrest me, try -- just
18  try to arrest me, go ahead, try it. And Officer Larregui
19  started talking to her and as this was occurring I attempted
20  to put my handcuffs on her.

21  Q   Now before you did that, did you do anything with
22  the flashlight?

23  A   Yes, I did. I placed it back in my pocket, in my
24  right pocket.

25  Q   And why -- why did you do that?

26  A   Because I -- you can't handcuff somebody when you
27  have a flashlight in your hand.

1   Q   Um-hmm (affirmative). Okay. Then what happened
2   when you tried to handcuff her?
3   A   As soon as I tried to handcuff her, I went towards
4   her, she started moving her arms away from me in an attempt
5   to not allow me to handcuff her. You know, I told her to
6   put her hands behind her back --
7          MR. BARNES: I object, Your Honor. The
8          witness can say what she was doing, but she can't
9          testify to her intent in doing it.
10         MR. BOVE: I just asked him what happened,
11         Your Honor. I'm afraid I missed the nature of the
12         objection.
13         THE COURT: Well, I'm trying to -- my
14         recollection of the testimony was that she started
15         to move back, is what he said, with the intent of
16         not to handcuff her. Is that what your objection
17         is?
18         MR. BARNES: Yes, Your Honor. He can
19         certainly testify to all of her movements, but not
20         to her --
21         THE COURT: Then the portion -- the portion
22         of his testimony after the words, started to move
23         back, is stricken.
24  Q   Okay. Just tell us in your own words what
25  happened as you tried to handcuff her?
26  A   Okay. Trying to handcuff her, she said, you can't
27  arrest me, and I grabbed her by the arm and placed her up

1   against the wall and she was resisting. She was physically
2   making it very hard for me to bring her hands behind her
3   back.
4      Q   Um-hmm (affirmative).
5      A   Actually, I couldn't believe how strong she was.
6      Q   Okay. Then what happened?
7      A   Managed to get one cuff on her left wrist and then
8   the right wrist, and then she turned her head to past her
9   right shoulder looking back at me and she said to me, look
10  what you did, you bastard, you mother fucker. And I noticed
11  blood trickling down from her forehead.
12     Q   And then what happened next?
13     A   Then I started walking her out of the house, we
14  got to the threshold of the front door and she turned to her
15  right, kicked me twice in the leg, attempted to kick me a
16  third time and I spun her around.
17     Q   Um-hmm (affirmative).
18     A   And as soon as I started walking out of the house,
19  I immediately called for a paramedic and -- because I was
20  concerned for her injury, and I also called for a
21  supervisor, because she stated my sister is Officer Annie
22  Ortiz.
23     Q   Um-hmm (affirmative). Now when you were kicked,
24  did you perceive any pain as a result of the kick?
25     A   Yes, I did.
26     Q   And what, if anything, did you do after that?
27     A   As I'm walking her out of the house, she, like I

1  said, she said her sister was Officer Annie Ortiz and she
2  was saying, you don't know what you did, you're in big
3  trouble, you're in so much trouble. I got her to the car
4  and tried to place her into the car, she would not get in.
5  She actually wedged her feet like this, like so.
6           MR. BOVE: For the record, he seems to have
7        wedged his feet --
8           THE WITNESS: In between the door.
9           MR. BOVE: -- on the witness stand about
10        three feet apart.
11    A   Correct.
12    Q   And she locked both legs?
13    A   Yes, making it impossible for me to get her into
14  the car. I had to physically put her into the car, and once
15  I did, I had Officer Larregui stay at the car, which is
16  common practice because suspects tend to like to kick
17  windows out of cars.
18           MR. BARNES: Objection, Your Honor. The
19        testimony about what is common practice is not
20        responsive to the question.
21           THE COURT: Sustained.
22    Q   That's fine. What did you do after she was in the
23  car?
24    A   After she was in the car, Officer Larregui, like I
25  was saying, was watching her.
26    Q   And what did you do after that?
27    A   I went back into the home to look for any injured

1  there any struggle?  Was there any fighting?  Was any
2  fighting?  She said, no.  She was a little bit intoxicated,
3  I did smell the alcohol.  But other than that --
4           MR. BARNES:  Objection, Your Honor, move to
5              strike that portion of the testimony.  It's not
6              responsive.  He was asked, what's her demeanor,
7              and that's not part of demeanor.
8           MR. BOVE:  I think that when you ask what her
9              demeanor was, I think whether or not she was under
10             the influence, or appeared to be intoxicated, is
11             certainly part of the demeanor of a person.
12          THE COURT:  Overruled.
13   Q    What happened next?  What happened next?
14   A    We had just a brief conversation regarding her
15  sister, nothing major.  It seemed like nothing really had
16  happened, she just basically wanted her sister out of her
17  house for whatever reason.  Shortly after, Officer Alterio
18  arrived.
19   Q    Now before Officer Alterio arrived -- by the way,
20  remove that.  Strike that question.  What was the lighting
21  like in that hallway?
22   A    It was -- there's no -- I don't think there was
23  any light within the hallway.
24   Q    Okay.
25   A    There was light, like in the living room, and
26  maybe towards like the kitchen area.
27   Q    Okay.  Now did you take your flashlight out and

```
 1   check her for any injuries?
 2        A    I didn't have a flashlight.
 3        Q    Why was that?
 4        A    I left it in the car.
 5        Q    What happened when Officer Alterio arrived?
 6        A    When Officer Alterio arrived, my back was actually
 7   leaning on the wall that divides the living room, which was
 8   on my right --
 9             MR. BARNES:  I'm sorry, Your Honor, I
10        apologize.  I just can't hear the testimony.  That
11        last answer.
12             THE COURT:  Okay.  I don't know if maybe it
13        might be easier if you sit in the jury box?
14             MR. BARNES:  That would be fine, Your Honor.
15             THE COURT:  I mean, I'm going to remind the
16        officer to keep his voice up, but I know every
17        time that lawnmower goes up --
18             MR. BOVE:  I'm hoping they stop by the time
19        the jury comes out.
20             THE COURT:  Right.  Okay.  Hopefully that
21        will accommodate -- of course now the mower has
22        stopped.
23        Q    What, if anything, happened when Officer Alterio
24   arrived?
25        A    Okay.  When he arrived, my back was leaning on the
26   wall that divides the living room on the right and the
27   kitchen on the left.  At that point I'm standing like right
```