# EXHIBIT D

CR02 0181826 S                      :   SUPERIOR COURT

STATE OF CONNECTICUT                :   J.D. OF FAIRFIELD

VS.                                 :   AT BRIDGEPORT

DOLORES FONSECA                     :   MAY 27, 2003


BEFORE:   HONORABLE SHERIDAN MOORE,  JUDGE


APPEARANCES:

               NICHOLAS BOVE, JR., ESQUIRE
               Senior Assistant State's Attorney

               WILLIAMS BARNES, ESQUIRE
               For the Defendant


               KATHRYN KAY
               Court Monitor

1              J O R G E    L A R R E G U I

2         of Bridgeport Police Department, 300 Congress Street,

3    Bridgeport, Connecticut, having been first duly sworn,

4    testified upon his oath as follows:

5                   THE COURT:  Officer, keep your voice up.  The

6                   acoustics in here are pretty bad, we're dealing

7                   with an outside noise today that seems to be

8                   overwhelming.

9                   MR. BOVE:  I think they're cutting the grass

10                  before it rains again.

11                  THE COURT:  Okay.  Thank you.  So just keep

12                  your voice up.

13                  THE WITNESS:  No problem.

14   DIRECT EXAMINATION BY ATTORNEY BOVE:

15       Q    Good morning, Officer Larregui.

16       A    Good morning.

17       Q    Officer Larregui, how long have you been a

18   Bridgeport Police Officer?

19       A    In November it's gonna be three years.

20       Q    And were you on duty on August 10th, 2002?

21       A    Yes, I was.

22       Q    And did you have occasion to go to 347 Alpine

23   Street?

24       A    Yes, I did.

25       Q    And approximately what time was that?

26       A    I don't remember.  It's -- it was late in the

27   evening.

1    at the doorway.  He walked right in front of me, it was his

2    call, I was just there to back up.  I decided to walk

3    towards the kitchen and find out what was going on with the

4    lady that walked away.  As I walked towards the kitchen, I

5    spotted the lady down by the pool with another lady sitting

6    down just chitchatting.

7        Q    And then what happened?

8        A    I could hear Officer Alterio and Dolores having a

9    little discussion back and forth.  Regarding what, I

10   couldn't really hear it because I was more concentrating on

11   where this other lady went.  As I walked back, I saw Officer

12   Alterio shining his flashlight at Dolores.

13       Q    I'm just gonna show you what's already been marked

14   as Prosecution Exhibit -- State's Exhibit 1 --

15                   MR. BOVE:  Is it A or 1?

16                   THE CLERK:  A.

17       Q    A.  Is that the flashlight --

18       A    Yeah, that's similar to what we use, correct.

19       Q    And how was he shining the light?

20       A    Do you mind?  Because the way it's handled, it's

21   like a matter of right there.  This is just like the

22   distance, we're actually a lot closer than what this is.

23       Q    And what, if anything, happened when he did that

24   with his flashlight?

25       A    At that point Dolores became upset and she said,

26   don't do that again.  And she shoved the flashlight down and

27   Officer Alterio warned her about it.

1    Q    How did she shove the flashlight down?

2    A    She just pushed the flashlight down.

3    Q    Then what happened?

4    A    Officer Alterio went back again and shined the

5    flashlight to check for whatever, you know, any physical, we

6    were there on a domestic, and she shoved it down again.

7    Q    And then what happened at that point?

8    A    At that point Officer Alterio was now, after

9    warning her, he decided to put his flashlight away and began

10   to handcuff her.

11   Q    You saw him put his --

12        MR. BARNES:  Excuse me, Your Honor.  I have

13        no objection to the witness saying what happened,

14        but as far as him testifying about what Officer

15        Alterio decided, things about other people's state

16        of mind that he can't know.

17   Q    What did Officer Alterio do with the flashlight?

18   A    He put the flashlight away, we've got a little

19   small pocket in our pants, and he went for his handcuff and

20   he began to go into handcuffing procedure with Dolores.

21   Q    And what happened?

22   A    Dolores was a little bit upset because of the

23   action that the officer was taking.  At one point or another

24   she stated that, you don't know who you're messing with.  My

25   officer -- my husband is a police officer, my sister is a

26   police officer, and the -- you know, the officer just

27   continued to do his job handcuffing.

1       Q    And what happened next?

2       A    As he got one handcuff on her left hand, she was

3  very upset, she was being combative, she was fighting the

4  officer off.  The officer, to gain control, he shoved her

5  against the wall, which the door to the bathroom.

6            MR. BARNES:  I object.  He's saying, why

7            Officer Alterio did things, not what Officer

8            Alterio did.  He can't say what Officer Alterio

9            was thinking, so I'd ask that that answer be

10           stricken and the question re-asked with a caution

11           to state merely what he observed, not the state of

12           mind of other people.

13           THE COURT:  I think there's only one word

14           that's really a slip-up in the answer.  But,

15           Officer, will you make sure when you answer the

16           question, that you answer the question only in

17           what you observed.

18           THE WITNESS:  Okay.

19      Q    What did you see happen?

20      A    I saw Officer Alterio pull out his handcuff.  I

21  saw him trying to struggle with Dolores because she refused

22  to get handcuffed.  I saw Officer Alterio get the handcuff

23  on his left hand, and he was struggling with her.  I saw

24  Officer Alterio shove her against the door, which that's

25  when she cracked her head open and it began bleeding.  I

26  then spoke to Dolores and I said to her, just give me your

27  hand, everything is gonna be all right.  And she gave me her

1    right hand and I finished the handcuffing procedure.

2        Q    Now you indicated you saw her head strike

3    something?

4        A    She hit her basement door.

5        Q    And then what happened?

6        A    At that point, Officer Alterio has control of the

7    person, I step back and she walks -- they walk in front of

8    me and walk towards the outside door.

9        Q    Did you -- what, if anything, did you observe as

10   she was brought to the police car?

11       A    Officer Alterio is a wide person and she's small,

12   so I basically saw his back.  And they walked right out.

13       Q    Did you -- were you -- what, if anything, did you

14   observe when they got to the police car?

15       A    When they approached the police car, she refused

16   to get inside the car.  They were -- you know, she was

17   upset.  She refused to get in the car, he finally grabbed

18   her and shoved her inside the car.

19                  MR. BOVE:  I have no further questions.

20                  MR. BARNES:  Excuse me.

21                  THE COURT:  Take a moment.

22   CROSS-EXAMINATION BY ATTORNEY BARNES:

23       Q    Officer Larregui, you were the first person on the

24   scene; is that right?

25       A    Correct.

26       Q    Where'd you park your police cruiser?

27       A    Almost directly across the street from the house.

```
1      A    Correct.

2      Q    And as he stepped in front of Dolores Fonseca, did

3   she make any movement?

4      A    Movement like what way?

5      Q    Well, did she back up, move forward, did she move

6   to the side?  What did she --

7      A    She stood right in the same spot.

8      Q    Okay.  And when he talked to her, did she move?

9   That is, you testified that he's asking her questions, did

10  she move while he was doing it?

11     A    I don't know.

12     Q    You testified you stepped outside for less than a

13  minute?

14     A    Um-hmm (affirmative).

15     Q    You checked out the backyard and stepped inside?

16     A    Correct.

17     Q    During that time period, had Dolores Fonseca

18  moved?

19     A    I don't know.

20     Q    Did you -- I mean, was she standing in the same

21  place?

22     A    She was within the same hallway, yes.

23     Q    Yes, but was she standing in the same place she

24  was before?

25     A    Pretty much.

26     Q    And after that you testified you saw him bring up

27  the flashlight and there was the two episodes of knocking
```

1    the hand down?

2        A    Correct.

3        Q    And then was there a gap or period of time after

4    she knocked the flashlight down for the second time before

5    Officer Alterio attempted to cuff her?

6        A    I don't even remember that.

7        Q    You don't remember any gap?

8        A    No.

9        Q    He just did it right away?

10        A    It just happened really quick.

11        Q    It just happened.  Okay.  And once he tried to

12    cuff her, was there any period of time in which you and

13    Officer Alterio ceased your attempted to cuff her and then

14    resumed them later?

15        A    Repeat that again?

16        Q    Was there any gap during the time period that you

17    were trying to cuff her that, did you like let her go and

18    then try again to cuff her?

19        A    No.

20        Q    Now you testified that she turned off the light

21    after Alterio arrived?

22        A    She turned --

23        Q    When did -- when did she have the opportunity to

24    turn off the light?

25        A    She turned off the light when Officer Alterio

26    shined the flashlight at her.

27        Q    So you're testifying that he shined the flashlight

1          believes that the State has not met its burden.

2              THE COURT:  Okay.  Before you -- so you do

3          not intend to offer any other witnesses at this

4          time?

5              MR. BARNES:  No, I don't.

6              THE COURT:  Okay.

7              MR. BARNES:  I wanted to indicate that since

8          it's the State's burden, that the defendant

9          believes that the State has not met it, and that

10         that would be true whether the defendant

11         introduced any additional evidence or not.  As it

12         happens, I'm not going to introduce any additional

13         evidence on the motion.

14             THE COURT:  Okay.  Then I'll continue to hear

15         the --

16             MR. BARNES:  I'm sorry?

17             THE COURT:  I'll hear your argument.

18             MR. BARNES:  Okay.  Thank you.  There has to

19         have been probable cause for the arrest.  In fact,

20         probable cause to have any kind of forcible -- any

21         kind of detention of my client.  It is clear,

22         leaving aside the credibility issues, it's clear

23         from Officer Larregui's testimony and Officer

24         Alterio's testimony that Officer Larregui arrived

25         first, determined during this three to five minute

26         period from talking to my client that there was no

27         physical contact, no injury, and, in fact, of

```
 1          course, there appears to be no claim that there
 2          was any injury.  He was satisfied.  He testified
 3          that there was no big deal.  This was not a major
 4          issue.  His concern was for the sister who had to
 5          be removed.
 6               Officer Larregui candidly acknowledged that
 7          in police work this often happens.  People want
 8          you to remove someone who's drunk or a problem
 9          from their house and you go do it.  When Officer
10          Alterio arrived, instead of obtaining any
11          information from the first officer on the scene,
12          and instead of the officer on the scene offering
13          any, he proceeded to aggressively question my
14          client.  He heard, in response to that, my
15          client's undisputed claim that there were no --
16          there was no physical contact, no problem.  In
17          other words, there were no injuries to search for.
18          That had already satisfied Officer Larregui.
19          Officer Alterio decides that he's going to check
20          my client for injuries, although there's no
21          indication that there were any injuries, by
22          shining his flashlight in this area.  She happens
23          to be wearing a v-neck bathing suit.  I think that
24          later, if Your Honor lets the matter go to trial,
25          it'll become apparent why he decided to shine his
26          light in that exact place.  But he had no reason
27          to do it and he had no reason to approach her in
```

```
 1          that manner.  He had absolutely no basis for any

 2          of his subsequent -- any of his conduct.  He

 3          wasn't acting in the performance of his duties

 4          when he shone that flashlight on her.

 5               Consequently, there was no reason for this

 6          ever to have happened, and the subsequent charge

 7          that she was disorderly, interfered with him, or

 8          even committed assault upon him, is all pointless.

 9          There was no reason for him to have been there in

10          the first place.

11               Now I have a second point.  There's no

12          indication that there was any possible -- that

13          there was any kicking or blow.  Officer Larregui

14          was in a position -- any kicking by her.  Officer

15          Larregui, who was in a position to see it, saw

16          nothing.  She's being held and controlled faced

17          forward walking out the door.  It isn't -- there

18          is insufficient evidence for any jury to find for

19          there to be any probable cause that she actually

20          did commit this assault upon a police officer.

21               For that reason I would ask Your Honor to

22          dismiss.  I'd further point out that if there was

23          no probable cause for the arrest, then the

24          statements made in response to the arrest, or

25          during the arrest, have to be suppressed as the

26          fruit of the poisonous tree.  Consequently, if my

27          client made statements because she was angry or
```

1        unhappy, and I'm not conceding that what the State

2        says happened is exactly what did happen, but

3        let's assume that that's what happened, that she

4        made these statements, then there would be no

5        basis for admission of those statements.  They

6        should be suppressed because the arrest was bad.

7        Thank you.

8              THE COURT:  Attorney Bove.

9              MR. BOVE:  I believe the State has proven

10       that there certainly is more than enough probable

11       cause in this situation.  Officer Alterio was

12       directed to go there.  He was the primary officer

13       to go there.  Officer Larregui, as his cover

14       officer, happened to get there first and was there

15       for a few moments prior to Officer Alterio's

16       arrival.  The fact that he was able -- he asked

17       certain questions while Officer Larregui as to

18       what his assessment was at the scene when he had

19       -- didn't even have his flashlight to check her

20       for injuries, is -- is a long stretch to say from

21       that that Officer Alterio shouldn't have done his

22       job when he arrived.  In fact, as I asked Officer

23       Larregui on redirect, why didn't you -- why didn't

24       you tell him these things, he said, well, I'm just

25       a cover officer.  I'm there to protect Officer

26       Alterio's back, basically.  And that's what he did

27       do.  When Officer Alterio arrived, Officer

1     Larregui stepped back, investigated what had been

2     going on in the other room and came back.  He

3     witnessed part of the altercation.  We have

4     established that Officer Alterio was there in the

5     line of duty, he was on duty, he was in uniform.

6     And when he attempted to shine his flashlight on

7     the defendant, she slapped his hand and pushed the

8     flashlight away, not once but twice.  Even after

9     being warned by officer Alterio that she shouldn't

10    do that, that she was interfering with a police

11    officer.  And subsequent to that, there was the

12    scuffle, she hit her head on the door jam and as

13    he took her out we had Officer Alterio testify

14    that she, in fact, kicked him.  The fact that

15    Officer Larregui didn't actually see the kick

16    doesn't mean it didn't happen.  Because, as he

17    said, he was following right behind, he wouldn't

18    necessarily have seen it.  And I think that's a

19    judgment for the jury to make.

20          We basically have met all the elements in

21    this case, Your Honor, and I -- I believe that the

22    mere assertion by defense counsel that this is

23    much ado about nothing and that Officer Alterio

24    shouldn't have been doing there -- shouldn't have

25    been there at all doing his job, he was the one

26    who was directed to take the call.  He was the

27    primary officer.  You heard Officer Larregui say

1   that on more than one occasion, both on direct and

2   on cross-examination. He was there as the cover

3   officer. It was Officer Alterio's call, and that

4   means something. It means that the officer has to

5   investigate the call. It doesn't mean that when

6   the officer investigating the call arrives, that

7   they're supposed to have a discussion, a long

8   drawn out discussion, about whether we should even

9   be there. Officer Alterio started to ask some

10   questions. Things got out of control. It's the

11   State's position that wasn't Officer Alterio's

12   fault. And we believe we have proven that

13   certainly the motions to dismiss should be denied,

14   and as well, the motions to suppress the

15   statements that she made. Thank you.

16     MR. BARNES: Your Honor, just one point, and

17   I think it's significant. Mr. Bove spoke about

18   all the different responsibilities of the various

19   officers involved. How Officer Larregui's duty

20   was merely to protect the back of attorney -- of

21   Officer Alterio and how they weren't supposed to

22   communicate this information with each other.

23   There's no evidence of that. It's the State's

24   burden to establish by evidence the basis of its

25   case. There seems to be a lot of assumptions Your

26   Honor is being asked to make about police work.

27   To excuse officers not talking to each other and

```
1              to excuse what went on here.  Well, there's no
2              evidence of it.  Admittedly Officer Larregui said,
3              I was the cover officer, it was his call, he's got
4              to make the call.  But that's a long way from what
5              Mr. Bove just said as the explanation for why
6              there was probable cause to continue.  There's no
7              evidence as to the duties of the cover officer
8              versus the assigned officer when the cover officer
9              arrives first and interviews the person who made
10             the call.  I would frankly find it astonishing if
11             any superior officer in the police department
12             would testify that it is the obligation of a cover
13             officer and a reporting officer to completely
14             disregard what the covering officer did, just
15             because he happened to be the covering officer.
16             Even if he was there first, and even if he did
17             good police work, you have to disregard it
18             because, hey, he's only the covering officer.
19             It's by no means a given.  Mr. Bove is talking
20             about it as if it were a given.  But there's no
21             evidence of that.  Without evidence you have to go
22             with the fact that according to both officers,
23             they didn't have any reason to do what they did.
24             That is Alterio had no reason to examine her for
25             injuries.  He had no reason to shine that light
26             down her front.  He had no reason to get into the
27             altercation that lead to all of these bad things
```

1      happening.

2          There's no probable cause for this to have

3      happened in the first place.  And to allow the

4      prosecution to continue under those circumstances

5      would be, I respectfully submit to Your Honor,

6      inappropriate.  If that was -- if what Mr. Bove

7      said is at the heart of the prosecution's case, we

8      should have heard something about it.  We didn't.

9          MR. BOVE:  May the State just be heard

10     briefly, Your Honor?  We're here on a motion to

11     dismiss criminal charges.  It has nothing to do

12     with what counsel is saying the obligation of a

13     cover officer to communicate.  That's purely in

14     the realm of the twilight zone.  We're here to

15     decide whether, based on the sworn testimony of

16     two police officers, there is -- or there is

17     probable cause for disorderly conduct, interfering

18     with an officer and assault on an officer.  And

19     based on the testimony, I believe the Court can

20     only draw one conclusion.  We're not here to

21     decide whether things should have been done a

22     certain way based on the subjective opinion of

23     counsel.  The only evidence we've heard is the

24     evidence of the two officers about what went on,

25     and there's more than sufficient evidence to deny

26     the motion to dismiss.  Thank you.

27          THE COURT:  Looking first at the motion to

1    dismiss.  While the grounds -- well, I guess the

2    grounds as stated fall under Section 41-8(5),

3    which is insufficient -- insufficiency of evidence

4    or cause to justify the bringing or continuing of

5    such information and placing the defendant on

6    trial.  Counsel for the defense has made an

7    argument that there was no probable cause based on

8    the Officer Larregui's original assessment of the

9    situation.  I believe that we are dealing with two

10   actual incidents.  The incident that originally

11   was the call and the State's allegation of what

12   occurred after the police officers arrived, which

13   ultimately lead to the arrest of Ms. Fonseca.

14       While it may be true that there was no

15   determination -- or there was a determination of

16   no probable cause or ultimately no arrest made in

17   the original call, it does not make the officer's

18   visit illegal.  They were there on a legitimate

19   call for a purpose as determined by the phone call

20   of the claim made by Ms. Fonseca of an unwanted

21   party at her home.  In fact, the reason, it may

22   happen many times, the reasons why an officer is

23   originally called may not be, in fact, a valid

24   reason or a -- one that results in an arrest or a

25   finding of probable cause.  It does not negate the

26   officer's legitimate purpose for being there.

27       Now once there, the State's claim is events

1       happened that ultimately resulted in the arrest of

2       Ms. Fonseca.  The Court, in making a determination

3       of a motion for dismiss, has to view the evidence

4       in a light most favorable to the State.  The

5       State's burden is only a preponderance of evidence

6       to sustain the Court's finding in their behalf on

7       the motion to dismiss.

8            The basis of the defense's first claim as to

9       Officer Alterio's behavior is that his

10      investigation was not necessary given the fight --

11      given the light that Officer Larregui -- or

12      Larregui, I'm going to keep saying that wrong,

13      Larregui was there already and have already done a

14      investigation.  While certain conduct by officers

15      are scrutinized by the Court, investigation

16      procedures are not scrutinized unless, in fact,

17      the conduct is extreme and against given

18      principles already enumerated by case law.  In

19      this particular case, the Court does not find that

20      Officer Alterio's investigation procedures were

21      extreme or falling in the prescribed prohibited

22      conduct.

23           The Court only has to find that there was, in

24      fact, evidence or testimony as it was by these two

25      officers.  First, Officer Alterio who indicated

26      that his actions were to investigate the incident

27      regardless of what Officer Larregui's previous

1       determinations had been made.  And Officer

2       Larregui's testimony that he step back and did not

3       offer any information because he believed that it

4       was Officer Alterio's investigation.  Whether or

5       not the State is correct or the defense is correct

6       as to what the actual procedures may have been by

7       the department, the Court has no information.  All

8       the Court can act on is what the testimony that it

9       heard today, and that is the testimony of these

10      two officers and their information and belief at

11      the time that they were involved in this

12      particular action.  And each officer indicated

13      that one took the forefront because he believed it

14      was his obligation to do so.  One stepped back

15      because he believed it was the other officer's

16      obligation to do so.  Given the testimony of the

17      officers, the Court is not going to make a

18      determination that any one investigation practice

19      falls within the prohibited actions as determined

20      by our past case law.

21           In regards to the situation of the kicking,

22      that is a factual question for the jury and the

23      testimony of the officer will be evaluated by the

24      jury at the time.  Accordingly, the motion to

25      dismiss is denied.

26           In regards to the motion to suppress, I don't

27      believe that any of the statements as made by the

1    defendant, while they are evidence of maybe her

2    demeanor and attitude, are not the basis of the

3    information against the defendant.  The

4    information, as I read the long form information,

5    speaks to the disorderly conduct is fighting or

6    engaging in behavior.  Interference is the hitting

7    of the flashlight.  And the assault is the

8    kicking.  Even -- so I don't think they form the

9    basis of the charges against her.  Even if that's

10   the case, the statements would not be suppressed

11   because the statements that I heard testimony as

12   to, at least today, deals with before there was

13   any arrest.  My understanding was those statements

14   were made during the course of the flashlight

15   incident.

16       But, as I said, I think the -- they don't

17   form the basis of the -- they don't lend to the

18   State's case as to any basis.  Statements made by

19   the defendant to the police officer may be

20   construed as free speech, but I don't think the

21   State's making an allegation that she made any

22   statements that were ultimately lead to or were

23   the basis of her arrest.  All of her -- the basis

24   of the arrest, as I read the long form

25   information, deals with physical contact or --

26   and/or with either objects or the officers in

27   particular.  So the motion to suppress is also

1          denied.