**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

DOLORES FONSECA, RAFAEL          :
FONSECA and MELANIE FONSECA,     :
  Plaintiffs,                  :
                          :
    v.                           :
                          :
JASON ALTERIO, a Bridgeport      :
police officer, in his           :    Civil No. 3:03-CV-1055(AVC)
individual capacity; JORGE       :
LARREGUI, a Bridgeport police    :
officer in his individual        :
capacity; and the CITY OF        :
BRIDGEPORT, a municipal          :
corporation,                     :
  Defendants.                  :

**<u>RULING ON THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

This is action for damages and equitable relief brought pursuant to 42 U.S.C. § 1983 and state statutory law in connection with alleged violations of the United States Constitution.  The plaintiff, Dolores Fonseca, "alleges violations of her federal civil rights based on false arrest, malicious prosecution, excessive force, cruel and unusual punishment, and race and sex discrimination.  Her husband, plaintiff Rafael Fonseca, claims a loss of consortium."  Specifically, the complaint, in relevant part, alleges:

> <u>Count Two</u>: Violation of the Civil Rights of Plaintiff
> Dolores Fonseca by Defendant Larregui.
> <u>Count Four</u>: Deprivation of Plaintiff Rafael Fonseca's
> Right to Consortium Without Due Process of Law.
> <u>Count Five</u>: Liability of Defendant City of Bridgeport
> for the Civil Rights Violations Committed by Defendants
> Alterio and Larregui.
> <u>Count Seven</u>: Statutory Liability of Defendant City of
> Bridgeport to Indemnify Defendants Alterio and Larregui
> Pursuant to Conn. Gen Stat. §§ 7-101a and 7-465.
> <u>Count Eight</u>: Statutory Liability of Defendant City of

Bridgeport to Indemnify Defendants Alterio and Larregui Pursuant to Conn. Gen Stat. § 52-577n.[1]

The defendants, the city of Bridgeport and Jorge Larrgeui, now move for summary judgment as to the claims against them asserting, <u>inter alia</u>, that "(1) [t]here is no direct evidence that Officer Larregui did anything but his job; (2) the plaintiffs' claim against the city of Bridgeport is speculative and without support that the city of Bridgeport police department engaged in any action which caused the alleged constitutional violations; and (3) the plaintiffs' state law claims are not supported by the evidence or law as to the defendants."

For the reasons hereinafter set forth, the court concludes that (1) with respect to Count Two, an issue of material fact exists as to whether Larregui had a realistic opportunity to intervene, hence, summary judgment is inappropriate; (2) with respect to Count Four, the defendants did not address plaintiff Rafael Fonseca's claim for loss of consortium, hence, summary judgment is inappropriate; (3) with respect to Count Five, the plaintiffs have not satisfied their burden of showing that the city of Bridgeport had a policy or custom of deliberate indifference to the use of excessive force by its officers,

---

[1]The plaintiffs initially brought a "federal civil rights conspiracy claim set forth in Count Three . . . negligence claims in Count Six, and . . . negligent hiring and supervision claims contained in Count Nine.  On January 13, 2006, the plaintiffs stated that these "claims and counts will be withdrawn."

hence, summary judgment is appropriate; (4) with respect to Count Seven, the plaintiffs are not entitled to declaratory relief under either Connecticut statute listed, hence, summary judgment is inappropriate; (5) with respect to Count Eight, the plaintiffs seek declaratory relief under a Connecticut statute that is "reserved for future use", hence, summary judgment is appropriate.  The motion for summary judgment is therefore GRANTED in part and DENIED in part.

## **FACTS**

Examination of the pleadings, the motion for summary judgment, the memoranda in support thereof, the local rule 56(a) statements, the response and the attachments thereto, discloses the following undisputed, material facts.

On August 10, 2002 at approximately 11:00 p.m., the plaintiff, Dolores Fonseca, called "911" from her home in Bridgeport, Connecticut.  She asked for help in dealing with one Debbie Alicea, Dolores Fonseca's sister that was allegedly intoxicated and "just being obnoxious."  In response, the defendant, city of Bridgeport, acting through the Bridgeport police department, sent out two radio dispatch calls.  Defendant police officer, Jason Alterio, received one call "to respond to a domestic with a drunken sister."  At roughly the same time, the defendant police officer, Jorge Larregui, responded to a call seeking back-up.

Larregui arrived first at the Fonseca residence.  He walked inside and "saw [Debbie] walking across the hall into the kitchen and then out the back door."  Dolores Fonseca then emerged from a bedroom and spoke with Larregui in the hallway of the house. Laregui learned that "nothing really had happened . . . she just wanted her sister out of her house, for whatever reason."  He also "saw no injuries on Mrs. Fonseca, and could 'definitely' see that she was not bleeding from the face."

Roughly three to five minutes later, Alterio arrived. According to Dolores Fonseca, Alterio did not ask Larregui about "what had happened or whether he had inquired about or checked for injuries."  Thereafter, Larregui went to look for Debbie, who had walked out the back door.

Alone with Alterio in the hallway, Dolores alleges that he asked her "if anybody was touching each other physically."  She responded no and "did not mention any injuries and he did not see any."  She further alleges that although the hallway had sufficient lighting, Alterio shined his flashlight on her, not to confirm the absence of any injury, but rather to "illuminat[e] her neck area and . . . her breasts."  As this occurred, Larregui had reentered the hallway and "observed Alterio shining his flashlight on Mrs. Fonseca."

"[O]utraged by what she considered indecent and intimidating behavior," Dolores Fonseca pushed the flashlight out of Alterio's

4

hand.  Alterio responded to her actions in the following manner:

> I tell her, I said, don't do that again, I
> used a stern voice, I said, don't do that
> again and I told her not to touch me.  You
> are committing an assault on a police
> officer.

He then allegedly proceeded to shine the flashlight a second time
on the same area of her body and "she pushed it down again."

Alterio then "went for his handcuffs" to put her under
arrest.  "In order to get control of her and place her arms
behind her", Dolores Fonseca alleges that Alterio "struck [her]
on the head with the flashlight . . . forcefully grasped [her]
left wrist, pulled her left arm up, spun her around and slammed
her face first into a hallway door."  At this point, she
allegedly began to bleed "freely from a cut on her forehead . . .
[t]he blood stained the door [in the hallway] . . . and dripped
on the hallway floor."  Dolores Fonseca further alleges that
Alterio "put a handcuff on [her] left wrist, grabbed her arms and
punched her several times in the back."

Thereafter, Larregui assisted Alterio in getting the
handcuff on her right wrist, which she alleges, made "her even
more vulnerable to Alterio's continuing brutality, as he pushed
her through the house, while she was bleeding profusely from the
head, and across the street to his cruiser."  In addition, she
alleges that, instead of handcuffing her, when "Alterio was
behaving bizarrely and improperly when he was shining his

flashlight into Mrs. Fonseca's chest area [and] when he grabbed her wrist and went for her hands and was utilizing necessary force in his attempt to force her hands into the handcuffs, Larregui should "have physcially protected the petite woman who was being manhandled by Alterio."

Although not present on the night of August 10, 2002, the plaintiff Rafael Fonseca, Dolores' husband, alleges that the defendants "unlawfully deprived [him] of his right to consortium with his wife."

On June 13, 2003, the plaintiffs brought the instant action seeking damages pursuant to 42 U.S.C. § 1983 for alleged violations of the United States Constitution.  They also seek damages and equitable relief pursuant to state law.

On November 8, 2005, the defendants, the city of Bridgeport and Jorge Larregui, filed the within motion.

## STANDARD

Summary judgment is appropriately granted when the evidentiary record shows that there are no genuine issues of material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). In determining whether the record presents genuine issues for trial, the court must view all inferences and ambiguities in a light most favorable to the non-moving party.  See Bryant v. Maffacci, 923 F.2d 979, 982 (2d Cir. 1991).  A plaintiff raises a genuine

6

issues of material fact if "the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rule 56(c) "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is not a genuine issue of material fact." Id. at 247-48 (construing Fed. R. Civ. P. 56 (c)).

In opposing a motion for summary judgment, the "adverse party may not rest upon the mere allegations or denial of [its] pleading," but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998). "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e). "The mere verification by affidavit of one's own conclusory allegations is not sufficient to oppose a motion for summary judgment." Zigmund v. Foster, 106 F.Supp.2d 352, 356 (D. Conn. 2000). Furthermore, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient [to avoid the entry of judgment against the non-moving party]; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson v. Liberty, Inc., 477 U.S. 242, 248 (1986).

## DISCUSSION

1.   "Count Two: Violation of the Civil Rights of Plaintiff
     Dolores Fonseca by Defendant Larregui"

     The defendants first argue that "there is no direct evidence

that Officer Larregui did anything but his job" on the night of

August 10, 2002.  Specifically, they contend that the

"[p]laintiff has not, by her own description of the actions,

demonstrated that Larregui had a realistic opportunity to

intervene to prevent the harm [to Dolores] from occurring."

     In response, the plaintiffs maintain that "there is clearly

a factual dispute as to whether Larregui had a realistic

opportunity to intervene."  Specifically, they argue "that

Larregui-acting as a reasonable police officer would have acted"

should have known that Dolores "needed protection from potential

further violence [from Alterio]."  The court agrees with the

plaintiffs that a factual dispute exists.

     "It is widely recognized that all law enforcement officials

have an affirmative duty to intervene to protect the

constitutional rights of citizens from infringement by other law

enforcement officers in their presence."  Anderson v. Branen, 17

F.3d 552, 557 (2d Cir. 1994) (internal citations omitted).  "An

officer who fails to intercede is liable for the preventable harm

caused by the actions of the other officers where that officer

observes or has reason to know that excessive force is being used

. . . or that any constitutional violation has been committed by

8

a law enforcement official." <u>Anderson v. Branen</u>, 17 F.3d 552, 557 (2d Cir. 1994) (<u>citing</u> <u>O'Neill v. Krzeminski</u>, 839 F.2d 9, 11 (2d Cir. 1988)).  For liability to attach, the officer must have had a "realistic opportunity to intervene to prevent the harm from occurring." <u>O'Neill</u>, 839 F.2d at 11.  "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." <u>Id</u>.

In the present action, Dolores alleges that "without telling her that she was under arrest and without asking for her wrists, Alterio went for his handcuffs and began trying to put them on her."  After they "struggled" and he "managed to get a cuff on one of her wrists," Dolores further alleges that Alterio then "grabbed her, twisted her around and shoved her face against a hallway door."  Thereafter, having positioned her "with her gashed face against the wall, he allegedly "pressed his large body into her small one to hold her up."  Larregui, who had been present in the hallway as the "struggle" between Dolores and Alterio occurred, then helped "to complete the arrest by cuffing Mrs. Fonseca's other wrist."

Construing the evidence in a light most favorable to the plaintiff, the court must conclude that a reasonable juror could find that the alleged use of excessive force by Alterio did not

occur in "such rapid succession" so as not to afford Larregui "a realistic opportunity" to intervene.  Cf. O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988)(finding that an officer "had no realistic opportunity" to prevent another officer from striking a person with three quick blows).

In sum, an issue of material fact exists as to whether Larregui had sufficient time to prevent Alterio from using alleged excessive force on Dolores; hence, defendants' motion for summary judgment, with respect to Count Two, is denied.[2]

2.    "Count Four: Deprivation of Plaintiff Rafael Fonseca's Right to Consortium Without Due Process of Law"

The defendants next move for summary judgment with respect to Rafael's claim for loss of consortium.  However, they provide no reason as to why summary judgment is appropriate; as a result, defendants' motion, with respect to Count Four, is denied.

3.    "Count Five: Liability of Defendant City of Bridgeport for the Civil Rights Violations Committed by Defendants Alterio and Larregui"

The city of Bridgeport ("city") moves for judgment as a matter of law arguing that the plaintiffs have failed to establish the liability of the defendants in an action under § 1983.  Specifically, the city contends that the plaintiffs have

---

[2]Count Two of the complaint also alleges that Larregui "unlawfully and falsely imprisoned" as well as "unlawfully and maliciously prosecuted Plaintiff Dolores Fonseca."  The defendants, however, have not discussed these claims in their motion for summary judgment and the memoranda in support thereof; hence, the court does not address these claims.

not provided "any specific information or evidence" demonstrating that the "City of Bridgeport . . . knew officers were routinely engaged in unlawful conduct, [much less], encouraged these violations."

In response, the plaintiffs maintain that "the available evidence is more than sufficient to create a material issue of fact regarding the existence of a policy of deliberate indifference to police use of excessive force against citizens." They further argue that the city's own documentary evidence "speaks volumes [about] the policies and customs of the City of Bridgeport with respect to non-discipline of officers for use of excessive force."

To establish the liability of a municipality in an action under § 1983, "a plaintiff must establish that the violation of his constitutional rights resulted from a municipal custom or policy." Vann v. City of N.Y., 72 F.3d 1040, 1049 (2d Cir. 1995). A plaintiff, however, does not need to show "that the municipality had an explicitly stated rule or regulation" Id.; accord Villante v. Dep't of Corr., 786 F.2d 516, 519 (2d Cir. 1986), but "may establish the pertinent custom or policy by showing that the municipality, alerted to the possible use of excessive force by its police officers, exhibited deliberate indifference." Vann, 72 F.3d at 1049; see also Fiacco v. City of Rensselaer, 783 F.2d 319, 327-28 (2d Cir. 1986). "To prove such

11

deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious." Vann v. City of N.Y., 72 F.3d 1040, 1049 (2d Cir. 1995). A plaintiff may demonstrate such a need through proof of "repeated complaints of civil right's violations . . . [and] no meaningful attempt on the part of the municipality to investigate [complaints] or to forestall further incidents . . . ." Id.

In Fiacco v. Rensselaer, 783 F.2d 319 (2d Cir. 1986), a case relied upon by the plaintiffs, the Second Circuit concluded that there was enough evidence so as to "permit a rational juror to find that the city had a policy of nonsupervision of its police officers that amounted to a deliberate indifference to their use of excessive force." Id. at 332. Specifically, the plaintiff presented "evidence of the failure of the city defendants to adopt appropriate procedures to deal responsibly with complaints of police brutality, and evidence of their failure to make reasonable investigations of such complaints." Id. at 328. In regard to specific allegations of police brutality, the plaintiff "introduced seven written claims that had been filed, called as witnesses four of the complainants, and elicited testimony from [the police chief] as to his handling of complaints." See Fiacco at 329. Taken together, the court noted that the evidence suggested that the city defendant's response to complaints of

12

excessive force "was uninterested and superficial." <u>Fiacco v.
Rensselaer</u>, 783 F.2d 319, 331 (2d Cir. 1986)

Conversely, in <u>Sarus v. Rotundo</u>, 831 F.2d 397 (2d Cir.
1987), a case relied upon by the city, the Second Circuit
concluded that "appellees . . . failed to present relevant proof
of a municipal policy or custom beyond their own arrests." <u>Sarus
v. Rotundo</u>, 831 F.2d 397, 403 (2d Cir. 1987). Unlike the
situation in <u>Fiacco</u>, the plaintiff did not present any evidence
that would suggest the police chief had "unbridled discretion" or
that the city's "system was lacking in any way, let alone so
deficient as to reflect a policy of deliberate indifference to
the civil rights of the citizenry." <u>Sarus v. Rotundo</u>, 831 F.2d
397, 401-402 (2d Cir. 1987). The court stated that "absent more
evidence of supervisory indifference, such as acquiescence in a
prior pattern of conduct, a policy [may] not ordinarily be
inferred from a single incident of illegality." <u>Id</u>. (<u>quoting
Turpin v. Mailet</u>, 619 F.2d 196, 202 (2d Cir. 1979) (internal
alterations in original)); <u>see also</u> <u>Oklahoma City v. Tuttle</u>, 471
U.S. 808, 823-24 (1985) ("Proof of a single incident of
unconstitutional activity is not sufficient to impose liability
under <u>Monell</u>, unless proof of the incident includes proof that it
was caused by an existing, unconstitutional municipal policy . .
. .").

The court agrees with the city that in terms of the evidence

presented, the instant action is much closer to Sarus v. Rotundo, 831 F.2d 397 (2d Cir. 1987) than Fiacco v. Rensselaer, 783 F.2d 319 (2d Cir. 1986).

    A.   General Complaints Against the City of Bridgeport
           Police Department

The plaintiffs argue that the 2000-2003 use of force reports "demonstrate that a Bridgeport police officer who uses excessive force, but reports it as being 'necessary' and 'appropriate' need not worry that there will be any meaningful review or independent evaluation of his actions, because the official policy of the city is to have supervisors automatically sign off on these reports." The city counters that "[t]he inherent fallacy with this submission is that the plaintiff without support of any wrongdoing, utilizes these forms to argue that because they exist and there was no finding of an improper use of force by the supervisor, you can assume that the police department has promoted the use of force." The court finds the city's argument persuasive.

Section 4.6 of Policy and Procedure of the City of Bridgeport, Police Department, (hereinafter "Bpt. Policy and Procedure") provides that "[o]fficers shall use only such force as is reasonable, necessary and authorized to effect an arrest and to defend themselves." Id. Notwithstanding, the use of such force may require an officer to submit an "accurate report" of the incident which is then "subject to a thorough and objective

evaluation" by a lieutenant and possibly a captain.  <u>Id</u>.[3]

The reports listed and actually attached[4] to the plaintiffs'
response to defendants' motion for summary judgment lend no
support to the suggestion that the Bridgeport police department
has a policy of deliberate indifference to the use of excessive
force by its officers.  The majority[5] of the reports involve a

---

[3]Section 4.6 further provides in relevant part that a "use
of report procedure will be followed whether or not an arrest is
made and under the following circumstances: (1) when any officer
purposely strikes, either with body parts, (feet, hand, knee) or
striking instrument, any performance during the performance of
his duties; (2) when scuffling or grappling with an arrestee or
person under lawful detention and using any degree or force of
physical restraint greater than the mere guiding, holding, or
handcuffing of someone; or (3) when an officer causes an injury
or a complaint of injury from a person as a result of any
physical confrontation as in (1) and (2).

[4]The court was unable to locate the following reports that
the plaintiffs listed in their response: 000129048, 001005248,
020227210, 02N725B, 030105010, 030301280 and 03061804.  It should
also be noted that the plaintiffs, for some reason, list the
following files twice: 001231162, 022122032 and 0221222235.  Both
things, of course, have the effect of inflating the actual number
of use of force reports.

[5]Some files have absolutely no relevance to the instant
action.  One illustrative, if not amusing, example is incident
file number 011113284 in which an officer responded to a call by
a store manager concerned about a rabid racoon "walking in
circles" and trying to get into his store.  After arriving and
receiving instructions "to terminate the animal," the dispatched
officer fired two shots at and killed the racoon.  Thereafter,
animal control "responded to the scene to remove the [racoon]."
No member of the racoon's family filed a formal complaint.  <u>See
also</u> incident file number 030324268 (noting that an officer had
been justified in shooting an attacking dog).

situation whereby an officer felt it necessary to use force[6] in an effort to subdue a person resisting arrest.  Interestingly, there were several examples of a lieutenant or captain commending the officer for "displaying tremendous courage and restraint in a situation that could have called for deadly force . . . ."  <u>See</u> Incident File No. 010131279.[7]  The lieutenant or captain, however, normally finds that the officer's use of force was "necessary and appropriate."  Therefore, to accept the plaintiffs' contention that these reports demonstrate a policy of indifference would require the court, without any evidence to the contrary, to disregard the conclusions of a lieutenant or captain who has extensive familiarity with the policy and procedures that an officer must comply with when using force.  The court declines to do so.

          The plaintiffs next argue that the "Bridgeport PD Disciplinary Report" ("PD Report") provides "powerful evidence of a custom or policy of ignoring excessive force by its police officers."  The report provides that in the ten years prior to the incident with Dolores, "not one officer was disciplined for

---

[6]The predominate types of force, as indicated by the reports, are the spraying of Oleoresin capsicum spray and the use of an officers' hands.  Other types of force reported were the releasing of a K-9 on a suspect and the use of batons and flashlights.

[7]<u>See also</u> Incident File Numbers: 01018195, 010225172, 010226273, 010624139, 011006274, 030129289, 030322318.

16

use of excessive force." This, the plaintiffs argue, is a "truly astonishing statistic and one that speaks volumes to the policies and customs of the City of Bridgeport with respect to non-discipline of officers for use of excessive force." Finally, the plaintiffs point to a document entitled "Bridgeport Police Department Final Resolution Report-I.A" ("FR Report") to demonstrate that: "(1) [t]he overwhelming majority of Internal Affairs complaints of excessive force by police officers were determined to be 'unfounded' or 'non-substantiated' or the officer was exonerated; (2) of the minuscule percentage of Internal Affairs that were 'referred' to either the police commission or the police chief, there is no indication that any discipline was imposed."

The city counters that the plaintiffs' interpretation of both reports is "factually wrong" in that both reports do not "relate only to claims of excessive force." With regard to the PD Report, the city maintains that it "is not a review to determine whether an officer acted in violation of the civil rights of an individual" but "is prepared to keep the special master in touch with the way discipline is distributed among the officers based upon ethnicity." With regard to the FR Report, the city states that this report provides "the records of all complaints and investigations, including internal, that were assigned to the Office of Internal Affairs during the time period

17

from 1993 forward." Specifically, the city argues that the
plaintiffs have "simply provided . . . a number of documents
without demonstrating their relevance to the issue at hand and
asks the court to find, without more, that the city of Bridgeport
has a custom." As a result, "[w]ithout specific testimony
connecting [the reports] with the allegations in th[e] complaint,
[the reports] have no meaning and no relevance to a claim of
policy, practice or custom liked to [Dolores'] claims." The
court again agrees with the city.

When a civilian files a complaint with the Bridgeport police
department, the office of internal affairs has "the
responsibility and authority to conduct, supervise and control
investigations, to make appropriate reports regarding citizen's
complaints of alleged misconduct made against any member [of the]
department." See Bpt. Policy and Procedure, 1.28.4 A. An
investigation involves the taking of statements from the
complainant, officer and any witnesses. Barros Decree, Sect.
VI.[8] Thereafter, a platoon captain or senior patrol officer
shall examine the evidence and draft a report, which the officer
then forwards "through the chain of command to the office of
internal affairs for review." Id. "Upon completion of the

_____

[8]The Barros Decree, U.S. District Court, Civil Action No. B-
482 (RCZ), sets forth the procedures and practices undertaken by
the Bridgeport police department and the office of internal
affairs when responding to citizen complaints made against
Bridgeport police officers.

18

investigation the office of internal affairs will inform the complainant in writing as to the outcome of the investigation . . . [i]f the complainant is not satisfied with the investigation, he or she may request an executive session hearing before the members of the Board of Police Commissioners." Id. Sect. X.[9]

Notwithstanding the plaintiffs' flawed interpretation that there are hundreds of complaints of excessive force filed against the Bridgeport police department each year, there is no contention that the city does not employ the above procedure when investigating complaints. (Porter Aff. ¶ 4). For example, in 2001, "[t]he number of cases alleging excessive force reviewed . . . was 16 cases of the 255 cases listed in the statistics report." Id.[10] Of those sixteen complaints, there is no indication that the Bridgeport police department and office of internal affairs did not thoroughly investigate each claim. Compare Sarus v. Rotundo, 831 F.2d 397, 401 (2d Cir. 1987) (concluding that evidence of "at least a dozen formal

_____

[9]It is worth noting that the "office of internal affairs [is] removed from the direct chain of command of the police department and reports to and is governed by the board of police commissioners with regard to . . . discipline . . . which shall be governed by the rules and regulations of the civil service . . . ." See Bpt. Policy and Procedure, 1.28.3 A; cf. Fiacco v. City of Rensselaer, 783 F.2d 319, 320-21 (2d Cir. 1986) (concluding that the police chief's unbridled discretion in investigating complaints of excessive force allowed him to overlook "what a thorough investigation would reveal").

[10]There had been nineteen cases filed, however, three of them were withdrawn.

disciplinary proceedings against . . . officers" does not suggest
that a "system was lacking in any way, let alone so deficient as
to reflect a policy of deliberate indifference"); with Fiacco v.
Rensselaer, 783 F.2d 319, 329 (2d Cir. 1986) (noting that
evidence presented of no disciplinary actions instituted against
individual officers supports the inference that a city "had
declined to implement [their own procedures]").

Moreover, the plaintiffs overlook the fact that "during the
time frame of 1999 until 2003 . . . there were no findings by a
jury or a court that any Bridgeport police officers used
unreasonable force in violation of civil rights." See (Massaro
Aff. ¶¶ 6&7) (listing the nine cases, six of which involved a
jury verdict and three of which the court dismissed on pre-trial
motions).  In addition, the city and officers obtained favorable
findings in two civil actions.  Id. at ¶ 8.  It should also be
noted that in June 2001, the city resolved one action by settling
with a civilian complaining of excessive force after "the officer
had been disciplined by the department and received a 3 months
suspension for the allegations."  Id. at ¶ 9.

To summarize, the plaintiffs submit exhibit after exhibit in
an effort to prove that the Bridgeport police department's
policies and procedures for dealing with complaints of excessive
force are a sham.  A review of the exhibits, however, suggest
that the police department thoroughly investigates each incident,

20

whether it be a civilian complaint or a use of force report filed by an officer.  Without evidence of the inadequacy of the city's procedures for resolving police brutality claims, the court cannot accept the plaintiffs' assertion that the "Bridgeport police department's . . . complaint process is effectively meaningless."

    B.   <u>Alterio's Complaint History</u>

The plaintiffs submit a one-page computer print-out produced by the City that simply lists all the complaints made against Alterio.  The print-out provides that approximately three months prior to the night of August 10, 2002 and "within a span of 25 days", three persons filed civilian complaints with the Bridgeport police department against Alterio.  The plaintiffs assert that "[t]hese facts reflect a police department with its head buried in the sand, routinely ignoring the actions of a police officer who seemed to be hurtling toward disaster."

In response, the city has provided the complaints filed against and the investigative files concerning Alterio and maintains that "a review of the . . . complaints does not support the plaintiff's assertion."

An examination of the civilian complaints filed against Alterio does nothing to support the plaintiffs' proposition or to suggest that the Bridgeport police department did not follow their own procedures or undertake a meaningful review of these

complaints.

To illustrate, one Joan Haggerty alleged that "Alterio was rude to her and did not conduct an investigation into her complaint of neighbors harassing her." Haggerty "believed there was a huge conspiracy against her and . . . demanded that the F.B.I. get involved in this investigation." Notwithstanding Haggerty's conspiracy theory, the Bridgeport police department, using the contact information given to them by Haggerty, attempted to interview a "possible witness to the incident"[11] and questioned Alterio, who maintained that "he was polite to Ms. Haggerty at all times" and investigated "into her complaint of neighbors harassing her." Thereafter, the police department found the complaint "to be unsustained, in that there was insufficient evidence to prove or disprove her claim."

The second complaint against Alterio involved an allegation by one Manuel Grajalez who maintains "he was arrested wrongfully." Grajalez had an argument with one Jason Silva, the boyfriend of Grajalez's ex-girlfriend, "over Manuel seeing his child." The argument culminated with Grajalez swinging a bat at Silva, who allegedly had a screwdriver. Grajalez considered his actions to be "self-defense." After interviewing witnesses,

---

[11]Haggerty listed a security guard as a possible witness to the incident. The Bridgeport police department called his place of employment only to learn that "he no longer worked for the company and that they could not furnish a contact number."

including Grajalez's girlfriend, and taking note of the fact that "no screwdriver was found at the scene," the Bridgeport police department concluded that "it was proper for Officer Alterio to charge Mr. Grajalez with Criminal Attempt to Commit Assault 3rd Degree."

The final complaint against Alterio involved, <u>inter alia</u>, an alleged illegal search and seizure complained of by one Richard Marino.  Alterio stated that "he stopped Mr. Marino because he was speeding and while doing so [dispatch] informed that the registration plate was reported stolen."  Thereafter, Alterio conducted a "pat down" of Marino "prior to placing him in the rear seat of the police cruiser because he was taking him into custody based on the information provided by the dispatch center."  Marino alleged that the "pat down" constituted an illegal search and seizure.  However, the office of internal affairs concluded that the "patted down search of Mr. Marino's person is common police practice as 'search incidental to arrest' prior to placing any suspect in the rear seat of any police cruiser regardless of reasonable suspicion that they may be armed."[12]

To summarize, none of the complaints examined separately or

---

[12]It should be noted that after Alterio patted down Marino, Alterio learned from another officer that dispatch made a mistake in regards to Marino having stolen plates.  The record provides that upon learning that Marino did not have stolen plates, Alterio "released Marino and apologized for the mistake."

as a whole demonstrate that the Bridgeport police department "had some notice of a policy, practice or custom of Alterio that required it to discipline, re-train or take other corrective action." It, of course, is worth noting that none of the complaints involved the use of alleged excessive force by Alterio. See Talib v. Garcia, 2000 U.S. Dist. Lexis 9752, at *15 (rejecting as a matter of law the contention that eight complaints filed against a specific officer, only two of which were for excessive force and both found not "credible", should put a city on notice that an officer "was capable of using excessive force"). Moreover, there is no contention by the plaintiffs that the Bridgeport police department failed to implement their procedures for undertaking investigations of these three complaints; they simply contend, without evidence to the contrary, that the Bridgeport police department must have arrived at the wrong conclusion.

In sum, the plaintiffs have fallen short of demonstrating that the Bridgeport police department has a policy of "deliberate indifference to excessive force." The defendants' motion for summary judgment, with respect to Count Five, is therefore granted.

4.    "Count 7: Statutory Liability of Defendant City of Bridgeport to Indemnify Defendants Alterio and Larregui"

The city moves for judgment as a matter of law on plaintiff's claim seeking a declaration that the "defendant city

24

of Bridgeport is required by Conn. Gen. Stat. §§ 7-101a and 7-465 to indemnify . . . Larregui for any liability [he] may have to plaintiffs in this action . . . ."  Specifically, the city argues that Connecticut law "provides that the city of Bridgeport is immune from liability for governmental actions which require the exercise of discretion."

The plaintiffs do not respond to the city's argument.  The court concludes that the plaintiffs are not entitled to declaratory relief under Conn. Gen. Stat. §§ 7-101a and 7-465.

In <u>City of W. Haven v. Hartford Ins. Co.</u> 602 A.2d 988 (Conn. 1992), the Connecticut supreme court "examined" both of the aforementioned statutes.  <u>City of W. Haven v. Hartford Ins. Co.</u> 602 A.2d 988, 991-93 (Conn. 1992).  The court "concluded that, pursuant to § 7-101(a)[13], [a] municipality is <u>not liable for</u>

---

[13]Conn. Gen. Stat. § 7-101a(a) provides in relevant part that "[e]ach municipality shall protect and save harmless any . . . municipal employee, of such municipality from financial loss and expense, including legal fees and costs, if any, arising out of any claim, demand, suit or judgment by reason of alleged negligence, or for alleged infringement of any person's civil rights, on the part of . . . such employee while acting in the discharge of his duties."  Subsection (b) of 7-101a provides that "[i]n addition to the protection provided under subsection (a) of this section, each municipality shall protect and save harmless any . . . municipal employee from financial loss and expense . . . . arising out of any claim by reason of alleged malicious, wanton or wilful act or ultra vires act, on the part of such employee while acting in the discharge of his duties."  <u>Id</u>. Significantly, the second sentence of subsection (b) provides that "[i]n the event such . . . <u>employee has a judgment entered against him for a malicious, wanton or willful act</u> in a court of law, such municipality shall be reimbursed by such . . . employee for expenses it incurred in providing such defense and <u>shall not</u>

<u>indemnification of any financial loss resulting from a malicious,</u> <u>wilful or wanton act</u>"; and that "a municipality is obligated, pursuant to § 7-465[14], to indemnify a municipal employee <u>unless</u> <u>the municipal employee acted wilfully or wantonly</u>.  <u>Id</u>. at 993 (emphasis added); <u>cf</u>. <u>Karbowicz v. Borough of Naugatuck</u>, 921 F.Supp 77 (emphasis added) (noting that a municipality is entitled to indemnify an employee who is liable "for <u>negligent</u> performance of discretionary acts").

The complaint alleges that "Larregui's conduct was motivated by evil motive or intent, or involved reckless or callous indifference to the federally protected rights of Plaintiff Dolores Fonseca."  The former two allegations, of course, do not suggest that Larregui was negligent "in the discharge of [his] duty."  Conn. Gen. Stat. § 7-465; <u>see</u> <u>also</u> <u>Menzie v. Kalmonowitz</u>, 139 A. 698 (Conn. 1928) ("Wanton misconduct is reckless misconduct.").  With regard to the latter allegation of

_____

<u>be held liable to such . . . employee for any financial loss or</u> <u>expense resulting from such act</u>." <u>Id</u>. (emphasis added).

[14]Conn. Gen. Stat. § 7-465(a) provides in relevant part that "any city . . . shall pay on behalf of any employee of such municipality . . . all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded for an infringement of any person's civil rights . . . if the employee, at the time of the occurrence, accident, physical injury or damages complained of, was acting in the performance of his duties and within the scope of his employment, and <u>if such occurrence, accident, physical injury or</u> <u>damage was not the result of any wilful or wanton act of such</u> <u>employee in the discharge of such duty</u>. <u>Id</u>. (emphasis added).

Larregui's conduct, "wanton acts are the equivalent of acts done
. . . with callous disregard for the purposes of General Statutes
§§ 7-101a and 7-465."  See City of W. Haven v. Hartford Ins. Co.
602 A.2d 988, 994 (Conn. 1992).[15]

Accordingly, defendants' motion for summary judgment, with
respect to Count Seven, is granted.

5.    "Count Eight: "Statutory Liability of Defendant City of
      Bridgeport Acts of Defendants Alterio and Larregui"

The complaint alleges that the "city of Bridgeport is liable
under Conn. Gen. Stat. § 52-577n . . . ."  However, Conn. Gen.
Stat. § 52-577n is "reserved for future use" and as such, the
court has no copy of the statute.  Accordingly, the motion for
summary judgment, with respect to Count Eight, is granted.

---

[15]There is no question that Larregui's acts on June 10, 2002
were discretionary.  Therefore, to the extent that it can be
inferred from the complaint that Larregui was negligent on the
night of June 10, 2002, the plaintiffs' claim for declaratory
relief must still fail.  See Evon v. Andrews, 559 A.2d 1131,
1133-34 (Conn. 1989).

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment (document no. 74) is GRANTED with respect to Counts V, VII and VIII and DENIED with respect to Counts II and IV.

It is so ordered this 16th day of August, 2006 at Hartford, Connecticut.


_____/s/_____
Alfred V. Covello
United States District Judge

28